UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KEVIN WHITZEL,                          :
                                        :CIVIL ACTION NO. 3:15-CV-456
          Plaintiff,                    :
                                        :(JUDGE CONABOY)
          v.                            :
                                        :
CAROLYN W. COLVIN,                      :
Acting Commissioner of                  :
Social Security,                        :
                                        :
          Defendant.                    :

_____

**MEMORANDUM**

Here the Court considers Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act.  (Doc. 1.)  In the December 15, 2015, Disability Report Plaintiff alleged that the following conditions limited his ability to work: back injury--herniated discs; back surgeries including one fusion; anxiety; panic attacks; depression disorder; and no feeling in his right leg.  (R. 284.)  When he applied for DIB and SSI Plaintiff alleged disability beginning on April 8, 2008.  (R. 22.)  However, he later amended the onset date to January 10, 2009.  (R. 45.)

The Administrative Law Judge ("ALJ") who evaluated the claim, Patrick S. Cutter, concluded that Plaintiff's severe impairments of lumbar spine pathology, depression, anxiety, and pain disorder did

1

not alone or in combination with other impairments meet or equal the listings. (R. 24-26.) The ALJ found that Plaintiff had the residual function capacity ("RFC") to perform light work with certain nonexertional limitations and that he was capable of performing jobs that existed in significant numbers in the national economy. (R. 26-36.) The ALJ therefore found Plaintiff was not disabled under the Act. (R. 36.)

With this action, Plaintiff argues that the decision of the Social Security Administration is error for the following reasons: 1) the ALJ failed to properly apply the treating physician rule (Doc. 12 at 16); 2) the ALJ erred in giving significant weight to the limitations set forth by an examining doctor but not including those limitations in his hypothetical to the vocational expert (*id.* at 19); 3) the ALJ erred in putting significant weight on the GAF scores (*id.* at 20); and 4) the ALJ erred in failing to find Plaintiff and his father credible (*id.* at 21). After careful consideration of the administrative record and the parties' filings, I conclude Plaintiff's appeal is properly denied.

## I. Background

### A.   *Procedural Background*

On December 7, 2011, Plaintiff filed applications for DIB and SSI. (R. 22.) As noted above, Plaintiff initially alleged disability beginning on April 8, 2008, due to a number of physical and mental conditions (R. 284) and later amended the onset date to

January 10, 2009 (R. 45).  The claims were initially denied on April 4, 2012.  (R. 22.)  Plaintiff filed a request for a review before an ALJ on April 20, 2012.  (*Id.*)  On August 2, 2013, Plaintiff, represented by an attorney, appeared and testified at a hearing.  (R. 42-86.)  Vocational Expert ("VE") Brian Bierley also testified.  (*Id.*)  ALJ Patrick Cutter issued his decision on August 12, 2013, finding that Plaintiff was not disabled under the Social Security Act through the date of the decision.  (R. 22-36.)  On August 30, 2013, Plaintiff requested a review with the Appeal's Council.  (R. 15-18.)  The Appeals Council denied Plaintiff's request on January 30, 2015.  (R. 8-14.)  On March 13, 2015, the Appeals Council set aside its January 30, 2015 action to consider additional information.  (R. 1.)  The Appeals Council again denied Plaintiff's request for review, concluding that the additional information related to a time after the ALJ issued his decision on August 12, 2013, and, therefore, it did not affect the decision about whether he was disabled beginning on or before that date. (R. 2.)  Plaintiff was advised that if he wanted consideration of whether he was disabled after August 12, 2013, he would have to apply again.  (*Id.*)

On March 5, 2015, Plaintiff filed his action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on May 7, 2015.  (Docs. 4, 5.)  Plaintiff filed his supporting

3

brief on August 12, 2015.  (Doc. 12.)  Defendant filed her opposition brief on August 26, 2015.  (Doc. 13.)  With the filing of Plaintiff's reply brief (Doc. 14) on September 23, 2015, this matter became ripe for disposition.

**B.   *Factual Background***

Plaintiff was born on October 15, 1969.  (R. 35.)  He has a high school education and past relevant work as a truck driver and warehouse worker.  (R. 34.)

**1.   Impairment Evidence**

**a.   *Physical Impairment Evidence***

Plaintiff had three surgeries on his lower back, the last being in January 2009.  (R. 45.)  He has been seen by several medical professionals and has had extensive treatment and testing for his back problems.

**i.   Stephen Powers, M.D.**

Plaintiff's January 8, 2009, fusion surgery was performed by Steven Powers, M.D., of the Pennsylvania Neurosurgery and Neuroscience Institute.  (R. 405.)

Two views of the lumbar spine taken on June 3, 2009, for postsurgical evaluation showed stable changes of L5 and S1 with no acute lumbar spine abnormality.  (R. 987.)

At a follow-up visit on October 12, 2009, Dr. Powers noted that other than some intermittent cramping of his right leg and some sleep disturbance, Plaintiff was "doing quite well."  (R.

4

419.)  In addition to reporting on Plaintiff's back condition In correspondence to Plaintiff's primary care physician, William S. Kauffman, M.D., Dr. Powers set out an assessment of Plaintiff's overall situation.  (*Id.*)

> Unfortunately, he was laid off by his employer about 1½ months ago and he is now caught up trying to find healthcare insurance for himself and also for his daughter that he has with his divorced wife, and trying to as he says, "find enough money to work around his monthly beer money."  His current situation is that he doesn't have any kind of and [sic] game that I can see in terms of his employment.  He is being advised by a couple people to seek out social security disability; however, I told him that at age 39 I think that is a huge mistake.  I know he has a lawyer involved and talked to him about trying to get some kind of retraining to be able to work within the restrictions that will be placed upon him because of his lumbar spine disease.
>
> His plain x-rays today show excellent early intradiscal and interbody fusion across L5-S1 space with a very stable appearing construct.  I don't see any changes at L4-5.  His examination shows normal strength in both lower extremities and now lower sciatic stretch or femoral stretch signs.  His current medications are Lyrica (75 mg, bid) and Tramadol (100 mg, one per day).  He is not taking any anti-inflammatories because he had nausea when he took Celebrex.  I think that he's capable of returning to work at this time with the permanent restrictions that he not lift or carry over 30 pounds and he needs to find some type of employment that allows him to go from sitting to standing frequently because of his chronic lower back pain related to his three previous surgeries.  He may need to undergo some type of educational retraining and I think this is a reasonable step to take in terms of getting

> him back into the work place.  Again, I think
> he is way too young to be considered for any
> type of long-term disability income as this
> would do nothing but create another burden
> for or [sic] society.  I am planning on
> having him return to see me in January for a
> final picture of his neck and if everything
> looks good at that time as it does now, then
> I will release him from my care.

(R. 419-20.)

On July 9, 2010, Dr. Powers referred Plaintiff to Justin Fisher, M.D., for a nerve conduction study because of recurrent back pain radiating into the right lower extremity and weakness of the right ankle.  (R. 385.)  Dr. Fisher concluded the following: "Abnormal study[;] [t]he electrodiagnostic evidence reveals, mild, chronic, right L5 and S1 radiculopathies, without evidence of active denervation at either level[;] there is no electrodiagnostic evidence of a lumbosacral plexopathy or neuropathy affecting the right lower extremity."  (R. 386.)

On October 14, 2011, Plaintiff was at the Pennsylvania Neurosurgery and Neuroscience Institute with complaints of worsening right leg pain and numbness over the preceding four months.  (R. 567.)  The plan was for Plaintiff to have a CT scan and MRI of the lumbar spine and to be seen again following testing. (*Id.*)  Plaintiff was advised that an EMG would be helpful to diagnose his condition but he refused because of the pain he suffered with previous EMG/NCS.  (*Id.*)

On November 3, 2011, Dr. Powers saw Plaintiff.  (R. 568-569.)

6

He provided the following summary in a letter to Dr. Kauffman:

> This gentleman has had a long-standing problem with the L5 Root which, unfortunately, did not recover completely. He did go off Valium recently because worker's compensation carrier apparently denied allowing him to keep using that. He thinks that this might have triggered some of the increased discomfort in his leg. I do not find anything on exam to suggest a progressive problem or an acute problem here. I believe that he has chronic neuropathic pain involving the right L5 nerve root, and he should be treated with medication in an attempt to try to resolve that. He apparently had been on Lyrica in the past and had some response to that but, for vague reasons, it was stopped. I am going to start him on Neurontin 100 mg. q.h.s. and increase this to b.i.d. after 3 days. After a few days of that, increase it to 3 times a day to see if this might give some additional relief in terms of his neuropathic leg pain. I have basically reassured him. There is nothing further from a neurosurgical standpoint that this gentleman needs. He has been released from our care again.

(R. 569.)

ii. **William Kauffman, M.D.**

Throughout 2011, Plaintiff complained of a backache to his family doctor, William Kauffman, M.D. (R. 590-605.) In Feburary 2011, Plaintiff's pain was rated as moderate in severity, Plaintiff was noted to walk with a mildly antalgic gait, his motor strength was intact, he appeared well, and there was no sign of acute distress. (R. 590.) Plaintiff again appeared well with no signs of acute distress in April 2011 and was assessed with backache and disc disorder. (R. 592.) Dr. Kauffman noted that he would try

7

more aggressive medication to "see if we can stay ahead of the pain so the message works for longer periods of time." (*Id.*)  In May Plaintiff reported that he was "doing some better, massage helps, but still just for a short time." (R. 594.)  Dr. Kauffman adjusted Plaintiff's medications. (*Id.*)  In August 2011, Plaintiff reported that his pain had been somewhat worse and he wondered if he had another disc "going bad" but messages continued to help. (R. 600.) Plaintiff said that he had an IME coming up and expressed a belief that "the evaluator will be in the back pocket of the insurance company." (*Id.*)  Examination showed that Plaintiff's back was tender around the scar and he had a decreased range of motion with flexion. (*Id.*)

On November 8, 2011 (a few days after Plaintiff saw Dr. Powers), Plaintiff presented to Dr. Kauffman for right lower limb pain, reporting it was exacerbated with activity. (R. 602.) Plaintiff reviewed the IME findings, stating the doctor had not been accurate in his reporting. (*Id.*)  Dr. Kauffman also reviewed Dr. Powers' letter of November 3ʳᵈ, stating that "[i]n reviewing the letter, it does not appear Dr. Powers feels that the patient could go back to work." (*Id.*)  Plaintiff had not yet started the Gabapentin Dr. Powers had prescribed but planned to do so. (*Id.*) Dr. Kauffman noted that he did not believe Plaintiff was able to work full-time. (*Id.*)

On November 23, 2011, Plaintiff was seen for follow-up and

reported to Dr. Kauffman that his pain was about the same but Xanax seemed to be helping.[1]  (R. 604.)  Plaintiff also stated that he would like to work; he was not sure what he would be able to do but was willing to go back to school and he did not have any skills that would enable him to do a desk job.  (*Id.*)  Dr. Kauffman stated that he was not sure Plaintiff would be willing to do a desk job for eight hours a day because he would have to get up and move around and change positions quite a bit.  (*Id.*)

On February 22, 2012, Dr. Kauffman filled out a Cumberland County Domestic Relations Physician's Information Request and indicated that Plaintiff had been continuously disabled since October 2008 and it was unknown when he would be able to go to work because of his back pain.  (R. 675.)

In February 2013, Dr. Kauffman continued to treat Plaintiff for back pain and Plaintiff reported a tingling pain down his right leg and difficulty standing, sitting, or walking for any prolonged periods of time.  (R. 671.)  Plaintiff reported that ibuprofen helped as did a medication prescribed by another physician.  (*Id.*)  On examination Plaintiff appeared well with no signs of acute distress, his mood and affect were normal, he was oriented x3, and his memory was intact.  (*Id.*)

On February 20, 2013, Dr. Kauffman completed a Medical Source

---

[1]  Xanax, which Plaintiff took instead of Valium, apparently helps with muscle spasms.  (R. 604, 606, 607.)

Statement. (R. 647-52.) He opined that Plaintiff could lift or carry up to ten pounds frequently, twenty pounds occasionally, and never over that. (R. 647.) He found that Plaintiff could sit for one hour, stand for three hours, and walk for one hour at a time without interruption in an eight-hour workday. (R. 648.) Totals for an eight-hour day were four hours each sitting, walking, and standing. (*Id.*) The use of his hands was unlimited except that he could reach overhead only occasionally. (R. 649.) Plaintiff could never operate foot controls with his right foot but could do so continuously with his left foot. (*Id.*) Dr. Kauffman concluded that Plaintiff could never climb ladders or scaffolds, stoop, kneel, crouch, or crawl, and he could occasionally climb stairs and ramps, and balance. (R. 650.) He found that Plaintiff could never tolerate extreme cold; he could occasionally be exposed to vibrations, unprotected heights, and moving mechanical parts, and operate a motor vehicle short distances. (R. 651.) Dr. Kauffman concluded that Plaintiff could not walk a block at a reasonable pace over rough or uneven surfaces. (R. 652.) Dr. Kauffman also opined that Plaintiff's limitations first presented in 2008 and that they had lasted or would last for twelve consecutive months. (*Id.*)

**iii.** **Richard Schmidt, M.D.**

On October 7, 2011, Richard Schmidt, M.D., a board certified orthopedic surgeon, performed an independent medical examination.

(R. 557.)  Plaintiff reported that he attributed his symptoms to heavy duty working over an extended period.  (*Id.*)  His complaints at the time of the IME were lower back pain on the right side and a sense of numbness down the outer aspect of the right calf into the outer aspect of the right foot dorsally. (R. 558.)  Plaintiff had no additional complaints.  (*Id.*)  Plaintiff said that he occasionally uses a cane in the house but not outside and he walks about one-half mile a day as part of an exercise program.  (*Id.*)  On examination, Plaintiff complained of some mild tenderness on palpation over the lower back on either side of the incision and decreased sensation over the outer aspect of the right calf and over the dorsal lateral aspect of the right foot.  (R. 559.)  Dr. Schmidt recorded that distal thigh, mid calf and ankle circumferences were equal by measurement, all deep tendon reflexes were +2 symmetric and brisk including right ankle jerk reflexes, motor strength was +5 throughout, both lower extremities were symmetrically strong, Plaintiff had a negative sitting root tension test actively performed to 90 degrees with no lower back or leg complaints, and a normal gait during the examination and when leaving the examination room.  (*Id.*)  Dr. Schmidt also performed active range of motion testing of the lower back: Plaintiff was able to forward flex and bring his fingertips down to the level of mid tibias, lateral bending was to 30 degrees bilaterally, and Plaintiff was able to achieve full extension of the lumbar spine.

11

(*Id.*)  Dr. Schmidt's Impression included the following:

> While the patient reports no improvement in his symptoms, I would note he is neurologically intact from the standpoint of any active radiculopathy.  He does have some mild decrease in sensation but motor strength and reflexes are normal.

> My impression at this time is that this patient is essentially at maximum medical improvement.  I do not see any need or benefit for further massage therapy.  In addition, the patient's medications should not be increased.  I believe the patient is capable of working in a light duty capacity.

(R. 560.)

Dr. Schmidt also completed an Estimated Physical Capacities form.  (R. 561.)  He estimated that in an eight-hour day, Plaintiff could stand for three to five hours, sit for three to five hours, sit/stand for five to eight hours, walk for one to three hours, and drive for one to three hours.  (R. 561.)  Dr. Schmidt estimated that Plaintiff could occasionally bend, squat, climb stairs, climb ladders, kneel, and crawl and he had no limitations in reaching above his shoulders or using his feet (foot controls).  (*Id.*) Plaintiff had no restrictions in using his upper extremities for repetitive grasping and manipulation.  (*Id.*)

**b. *Mental Health Impairments***

**i.  <u>Christopher Royer, Psy.D.</u>**

On March 8, 2012, Christopher Royer, Psy.D., performed a consultative psychological examination.  (R. 617-22.)  Plaintiff told Dr. Royer about his various pain issues including constant

muscle pain in his back, that he tries to avoid medication as much as possible, and he notices the pain more when he does not have distractions.  (R. 620.)  Plaintiff also reported anxiety and that it had been a lifelong problem for him.  (*Id.*)  The symptoms include nausea, that he vomits at times, his heart rushes, he feels lightheaded, and he has trouble taking a long trip in a car, being with others in public places, and going out to eat.  (*Id.*) Plaintiff also said that he feels "obsessive-compulsive"--he is particular with his clothes, checks his doors for being locked, puts his shoes in certain spots, and almost lost his job at the warehouse before the back injury because of obsessive issues. (*Id.*)  In addition, Plaintiff reported that he gets depressed and stays in bed, he sleeps poorly without medications, his appetite comes and goes, and he can go long periods without something to eat.  (R. 621.)

Plaintiff's mental status examination showed that he was fairly oriented, his ability to recall a list of four words after a brief delay was impaired, auditory attention was adequate, he tested in the moderately impaired range on a test of mental arithmetic, he made no errors on a test of serial three addition, his expressive speech was fluent, he was able to follow and comprehend all test instructions, his reasoning by analogy was within normal limits, and overall his fund of information was considered to be adequate for his age, education and background.

(R. 621-22.)  Dr. Royer found Plaintiff's affect to be quite anxious, he was talkative and somewhat pressured in his manner, he was "over-elaborative" when he was talking about his problems, and he saw himself as rarely, if ever, able to achieve periods where he is not anxious.  (R. 622.)  Dr. Royer's Impression included the findings that Plaintiff met the diagnostic classifications for generalized anxiety disorder and pain disorder secondary to both medical and psychological features, and he assessed a GAF of 50. (*Id.*)

Dr. Royer also completed a mental health source statement in which he opined that due to his anxiety and poor memory: Plaintiff had slight difficulty in his ability to understand, remember, and carry out short, simple instructions; he had moderate difficulty in his ability to understand, remember, and carry out detailed instructions; and he had moderate difficulty making simple work-related decisions.  (R. 617.)  Because Plaintiff was very anxious, prone to panic, Dr. Royer concluded Plaintiff had marked difficulties interacting appropriately with the public and coworkers and marked difficulty responding appropriately to changes in a routine work setting; and Plaintiff had moderate difficulties interacting appropriately with supervisors and responding appropriately to changes in ta routine work setting.  (*Id.*)

**ii.  Henry Wehman, M.D.**

On June 27, 2012, Henry Wehman, M.D., of the Stevens Center

14

performed a psychiatric evaluation after Plaintiff was referred because of depression and anxiety.  (R.  655-57.)  Plaintiff complained of increased anxiety, depression, and panic attacks. (R. 655.)  He reported that his primary care physician had prescribed alprazalon, 0.5 mg. t.i.d. but Plaintiff said he takes it only as needed and that the medication "takes the edge off" but he still has panic attacks.  (*Id.*)

Plaintiff said he had his first panic attack at age twenty and since then had significant agoraphobia and panic attacks since then.  (*Id.*)  He added that the panic attacks were limited to travel and to events in which he would be exposed to many people such as going out to dinner, shopping, going through tunnels or over bridges or in general anywhere he fees he cannot escape if he needs to.  (*Id.*) Plaintiff explained that his depression worsened in 2008 related to his loss of physical function and inability to work.  (R. 656.)

Dr. Wehman recorded that Plaintiff had no previous psychiatric treatment.  (*Id.*)  On mental status examination, Dr. Wehman noted that Plaintiff's range of affect was constricted and somewhat intense, his mood anxious and depressed, cognitive functions were within normal limits, and his judgment and insight appeared to be fairly good.  (*Id.*)  He diagnosed Plaintiff with major depressive disorder, recurrent and without psychotic features, panic disorder with agoraphobia, obsessive compulsive personality traits, and a

GAF of 50.  (R. 657.)

Following this evaluation, Plaintiff continued to attend regular medication management sessions with Dr. Wehman.  On September 6, 2012, Dr. Wehman reported that Plaintiff had a normal affect, depressed mood, normal stream of thought and thought content, generally intact cognitive and executive functions, and a GAF of 50.  (R. 661.)  On September 20, 2012, Dr. Wehman reported that Plaintiff had a normal affect, depressed mood, normal stream of thought and thought content, generally intact cognitive and executive functions, and a GAF of 60.  (R. 662.)  On November 29, 2102, Dr. Wehman reported that Plaintiff had a normal affect, euthymic mood, normal stream of thought and thought content, generally intact cognitive and executive functions, and a GAF of 80.  (R. 660.)  On February 21, 2013, Dr. Wehman reported that Plaintiff had a normal affect, normal stream of thought and thought content, and a GAF of 60.  (R.659.)  On May 28, 2013, Dr. Wehman reported that Plaintiff had a normal affect, euthymic mood, normal stream of thought and thought content, and a GAF of 80.  (R. 658.)

*c. Consultative Opinions*

i.   **Hong. S. Park, M.D.**

On January 30, 2012, Hong. S. Park, M.D., the State agency medical consultant, reviewed Plaintiff's records and found the following: Plaintiff was able to lift and/or carry twenty pounds occasionally and ten pounds frequently; he was able to stand and/or

16

walk for six hours in an eight-hour day; he could sit for about six hours in an eight-hour day; he would need to periodically alternate between sitting and standing to relieve pain and discomfort; and he was unlimited in his ability to push and pull.  (R. 137-38.)  Dr. Park opined that Plaintiff should avoid concentrated exposure to vibrations.  (R. 138.)

**ii.  Michael Suminski, Ph.D.**

On April 2, 2012, Michael Suminski, Ph.D., the State agency psychological consultant, completed a Mental Residual Functional Capacity Assessment.  (R. 139.)  Dr. Suminski concluded that Plaintiff had understanding and memory limitations in that he was moderately limited in his ability to understand and remember detailed instructions but could understand simple instructions. (R. 139-40.)  He found that Plaintiff had sustained concentration and persistence limitations in that he was moderately limited in his abilities to carry out detailed instructions and to maintain attention and concentration for extended periods.  (R. 140.) Regarding interaction limitations, Dr. Suminski opined that Plaintiff was moderately limited in his ability to interact appropriately with the general public and his ability to accept instructions and respond appropriately to criticism from supervisors.  (*Id.*)  He concluded that Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting.  (R. 141.)  In narrative form, Dr. Suminski stated

17

the following:

> The medical evidence indicates that the claimant is able to function in simple routine job tasks that require him to follow simple one and two-step instructions. He can use a personal computer. His ADLs are functional. He can follow written and spoken instructions despite his anxiety. He goes out alone, drives, shops and manages money.

(R. 141.)

### d. Other Opinion Evidence

Plaintiff's father, Paul Whitzel, completed a Function Report – Adult – Third Party on December 28, 2011. (R. 312-19.)  Mr. Whitzel said that Plaintiff's ability to work was limited in that he could not stand or sit in one position for very long.  (R. 312.) He noted that Plaintiff was unable to bend over to tie his shoes and he was unable to do household chores because of pain and his inability to bend and lift.  (R. 314-15.)  Mr. Whitzel said that Plaintiff keeps in touch with others on the phone and the computer and in person, and the places he goes on a regular basis are to the doctor and for therapy.  (R. 316.)  He noted that many abilities were limited because of Plaintiff's back problems but he was good at following instructions and getting along with authority figures. (R. 317-18.)   He also noted that Plaintiff had a lot of stress for which he was on medication and he handled changes in routine well. (R. 318.)

### 2.   **Hearing Testimony**

At the August 2, 2013, hearing, Plaintiff testified that he

was unable to work because he lost a lot of range of motion after his last surgery and is limited in just doing normal, routine things like putting on his shoes and there are days that he does not even want to get out of bed with the combination of back pain and depression.  (R. 49.)  He added that he has trouble walking because of numbness and tingling in his right leg, a problem that caused him to fall down the steps at home in the middle of the night a few months before the hearing.  (*Id.*)  Plaintiff noted that his anxiety and depression also kept him from working--he can just stay in bed a half day or more with no motivation and/or to avoid the outside world.  (R. 49-50, 53.)

Plaintiff described his back pain as similar to a constant toothache.  (R. 51.)  He said that some medication relieves the pain some but nothing takes it away completely, and cold, damp, rainy days are the worst.  (R. 51-53.)  He also said he sometimes has difficulty walking the one hundred yards to the mailbox.  (R. 52-53.)

Plaintiff testified that he sees Dr. Wehman for medication management for his mental health issues and he also sees a therapist once a week or every two weeks.  (R. 54.)

The ALJ first asked the VE to consider a hypothetical individual who had the residual functional capacity to perform a range of light work subject to the following limitations:

> The individual can sit up to four hours a
> day, stand up to four hours a day, walk up to

> four hours a day.  The work should be such
> that it can be performed either sitting or
> standing.  There's a need to only
> occasionally climb stairs, kneel, stoop,
> balance, or crouch, or crawl.  There's a need
> to never climb ladders, ropes, or scaffolds.
> The individual should only occasionally reach
> overhead.  There's a need to avoid
> concentrated exposure to vibration,
> temperature extremes, or dampness.  There's a
> need to avoid work at unprotected heights or
> around dangerous moving machinery.  There's a
> need to avoid operating motor vehicle.
> There's a moderate limitation . . . in the
> ability to understand, remember, and carry
> out detailed instructions; make judgments on
> simple work decisions; interact appropriately
> with supervisors, public, or co-workers; in
> the ability to respond appropriately to
> changes in a work setting or work pressures
> in a usual work environment.

(R. 80-81.)  The VE opined that a person with such limitations would be able to perform unskilled jobs in the national or regional economy.  (R. 81.)

The ALJ then added the restriction that the previously identified hypothetical individual had a marked limitation in his ability to interact appropriately with the public or coworkers and respond appropriately to changes in the ordinary work environment. (R. 82.)  The VE testifies that the added restriction would indicate an inability to maintain employment and would exclude all occupations.  (*Id.*)

The ALJ also asked if the first hypothetical person were expected to be off-task in addition to regular breaks for one to two hours a day on a consistent basis due to pain and the need to

lay down during the workday would that person be capable of gainful employment.  (R. 83.)  The VE answered that such a person would be excluded from all occupations.  (*Id.*)

Finally, the ALJ asked if the person in the first hypothetical were expected to be absent two to three times a month on a consistent basis would he be capable of gainful employment.  (R. 84.)  The VE responded that he would not.  (*Id.*)

**3.   ALJ Decision**

By decision of August 12, 2013, ALJ Cutter determined that Plaintiff was not disabled as defined in the Social Security Act from the alleged onset date of January 10, 2009, through the date of the decision.  (R. 36.)  He made the following findings of fact and conclusions of law:

> 1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.
>
> 2.   The claimant has not engaged in substantial gainful activity since January 10, 2009, the amended alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).
>
> 3.   The claimant has the following severe impairments: Lumbar Spine Pathology, Depression, Anxiety, and Pain Disorder (20 CFR 404.1520(c) and 416.920(c)).
>
> 4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d),416.925 and 416.926).

5.   After careful consideration of the
     entire record, the undersigned finds
     that the claimant has the residual
     functional capacity to perform light
     work as defined in 20 CFR 404.1567(b)
     and 416.967(b).  The claimant is able to
     sit for four hours, stand for four
     hours, and walk for four hours.  The
     claimant requires the ability to
     alternate sitting and standing at will.
     The claimant is able to climb stairs,
     kneel, stoop, balance, crouch, and crawl
     occasionally. The claimant is unable to
     climb ladders, ropes, or scaffolds.  The
     claimant is able to reach overhead
     occasionally.  The claimant should avoid
     concentrated exposure to vibration,
     extreme temperatures, and dampness.  The
     claimant should avoid performing work at
     unprotected heights or around dangerous
     moving machinery.  The claimant is
     unable to operate motor vehicles.  The
     claimant has a moderate limitation
     (moderate is defined as more than a
     slight limitation, but the function can
     still be performed on a consistent
     enough basis to be satisfactory to an
     employer) in his ability to understand,
     remember, and carry out detailed
     instructions, make judgments on simple
     work-related decisions, interact
     appropriately with supervisors, the
     public, and co-workers, and respond
     appropriately to changes in an ordinary
     work setting.

6.   The claimant is unable to perform any
     past relevant work (20 CFR 404.1565 and
     416.965).

7.   The claimant was born on October 15,
     1969 and was 39 years old, which is
     defined as a younger individual age 18-
     49, on the alleged disability onset date
     (20 CR 404.1563 and 416.963).

8.   The claimant has at least a high school
     education and is able to communicate in

English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404,1569(a), 416.969, and 416.969(a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 10, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 24-36.)

The ALJ specifically considered Listings 1.04, 12.04, and 12.06. (R. 25-26.) He concluded that Plaintiff did not meet the necessary criteria under any Listing. (*Id.*)

The ALJ discussed his RFC determination at length. (R. 27-34.) He found Plaintiff not to be completely credible regarding the intensity, persistence and limiting effects of his symptoms for several reasons including that Plaintiff's alleged pain and mental health symptoms are not supported by the objective evidence of record. (R. 34.) ALJ Cutter also reviewed the opinion evidence and explained the weight attributed to various opinions addressing

23

the effects of Plaintiff's physical and mental impairments.  (R. 31-34.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[2]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§

---

[2] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he
> applied for work.

42 U.S.C. § 423(d)(2)(A).

404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R. 36.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence

means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)*.*  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the

26

record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings

27

of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented."  *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

### A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits.  *See Dobrowolsky*, 606 F.2d at 406.  Social Security proceedings are not strictly

adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

## B.   *Plaintiff's Alleged Errors*

As set out above, Plaintiff argues that the decision of the Social Security Administration is error for the following reasons: 1) the ALJ failed to properly apply the treating physician rule (Doc. 12 at 16); 2) the ALJ erred in giving significant weight to the limitations set forth by an examining doctor but not including those limitations in his hypothetical to the vocational expert (*id.* at 19); 3) the ALJ erred in putting significant weight on the GAF scores (*id.* at 20); and 4) the ALJ erred in failing to find Plaintiff and his father credible (*id.* at 21).

1.    **<u>Treating Physician Opinion</u>**

Plaintiff first asserts that the ALJ failed to properly apply the treating physician rule to Dr. Kauffman's opinion on Plaintiff's limitations. (Doc. 12 at 16.)  I conclude the ALJ did not err on this basis.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.  *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).  The "treating physician rule," is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986).  The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).[3]  "A

---

[3] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal

cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); see also *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own

---

picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

Plaintiff specifically points to Dr. Kauffman's opinion that Plaintiff was unable to climb ladders or scaffolds, stoop, kneel, crouch, crawl, or walk a block at a reasonable pace on rough or uneven surfaces. (Doc. 12 at 16.) Plaintiff avers that the opinion is consistent with the opinion of Dr. Sumas and certain findings of Dr. Powers and Dr. Schmidt and is also supported by diagnostic testing.[4] (*Id.* at 17.)

I conclude the assignment of limited weight to Dr. Kauffman's opinion was not error because the ALJ provided valid reasons for his determination. (R. 32-33.) In his Decision, the ALJ explained the weight attributed to Dr. Kaufffman's opinion:

> As Dr. Kauffman is the claimant's primary care provider, his care is limited to routine physical examinations and medication management, and he is not an orthopedic specialist. The undersigned finds that Dr. Kauffman's opinion regarding the claimant's postural limitations and inability to walk a block at a reasonable pace on a rough or uneven surface are not supported by the orthopedic findings of record, including Dr. Powers' and Dr. Schmidt's findings that the claimant has 5/5 motor strength in his lower

---

[4] In this section of his supporting brief Plaintiff also questions the ALJ's RFC findings that Plaintiff was able to stand, sit and walk for four hours each in an eight-hour day. (Doc. 12 at 18.) The argument is not well-developed and does not undermine the weight attributed to Dr. Kauffman's opinion which is the issue raised with the first objection.

> extremities and negative straight leg raises
> to 90 degrees.

(R. 33 (citing Exhibits 5F and 6F (R. 556-585)).)

The governing regulation provides that more weight will generally be given "to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). Although Dr. Schmidt was an examining specialist, Dr. Powers was a treating specialist over a period of time. Therefore, under § 404.1527(c)(2), the ALJ did not err in giving Dr. Powers' opinion and findings more weight than Dr. Kauffman's opinion regarding Plaintiff's back issues.[5]

In his reply brief, Plaintiff urges reliance on Dr. Kauffman's opinion because it was rendered later in time than Dr. Powers' opinion. (Doc. 14 at 2.) I do not find such reliance warranted in that the ALJ reviewed Dr. Powers' treatment of Plaintiff following the testing referenced by Plaintiff (October 2011 MRI) (Doc. 13 at 2), and specifically noted that Dr. Powers "found that there was nothing in his examination of the claimant to suggest a progressive or acute problem." (R. 30.)

---

[5] Plaintiff's reference to the opinion of Dr. Sumas in support of Dr. Kauffman's opinion is misplaced for several reasons, most importantly that it relates to a time *after* the ALJ's decision and Plaintiff was in an automobile accident which reportedly exacerbated his back issues. (R. 88, 91.) As directed by the Appeals Council, if Plaintiff wants the Agency to continue whether he was disabled after the date of the ALJ's decision (August 12, 2013), he needed to apply for benefits again. (R. 2.)

Because I conclude that the ALJ did not err in not giving controlling weigh to Dr. Kauffman's opinion, Plaintiff's first claimed error is not cause for remand.

**2.   Examining Physician Opinion**

Plaintiff next asserts that the ALJ erred in giving significant weight to the limitations set forth by Dr. Schmidt, an examining doctor, but not including those limitations in his hypothetical to the vocational expert.  (Doc. 12 at 19.)  I conclude this claimed error is not a basis for remand.

Plaintiff specifically takes issue with the fact that the ALJ gave Dr. Schmidt's opinion significant weight but did not accurately portray the limitations found by Dr. Schmidt in his hypothetical to the VE.  (Doc. 12 at 19-20.)  Dr. Schmidt opined that Plaintiff could sit and stand for three to five hours in an eight-hour day and he could walk between one and three hours in an eight-hour day.  (R. 561.)  Plaintiff asserts that the hypothetical to the VE concerning an individual capable of sitting, standing, and walking for four hours in an eight-hour day (R. 26) was improper because it did not reflect the minimum amount of time Dr. Schmidt found Plaintiff able to sit, stand, and walk, i.e., sit and stand for three hours and walk for one hour.  (Doc. 12 at 19-20.)

Defendant responds that the ALJ did not err on this basis because his hypothetical did not consider only Dr. Schmidt's opinion but also Dr. Powers' opinions that Plaintiff could return

34

to work with restrictions but did not limit the hours for sitting, standing or walking.  (Doc. 13 at 19.)

    We agree with Defendant that the ALJ was not obligated to consider Dr. Schmidt's opinion in a vacuum when drafting his hypothetical to the VE.  (*See id.*)  ALJ Cutter afforded significant weight to the opinions of Doctors Schmidt, Powers, and Park.  (R. 31-32.)  He was not required to repeat each physician's restrictions verbatim nor was he precluded from combining these opinions to form his hypothetical.  While in some instances the ALJ did not include the precise durational limitations indicated by Dr. Schmidt, in other instances his limitations went further.  For example, Dr. Schmidt did not opine that Plaintiff required a sit/stand option, but the ALJ's hypothetical limited the individual to work that could be performed sitting or standing and his RFC stated that "[t]he claimant requires the ability to alternate between sitting and standing."[6]  (R. 26, 80, 561.)   Furthermore, Dr. Kauffman opined that Plaintiff could sit, walk, and stand for four hours each in an eight-hour day.  (R. 648.)   Though overall ALJ Cutter gave limited weight to Dr. Kauffman's opinion, he did not discount it completely.  (R. 53.)

    Because the ALJ's hypothetical adequately portrayed

_____

    [6]  Dr. Powers opined that needed "to find some type of employment that allows him to go from sitting to standing frequently."  (R. 420.)  Dr. Park opined that Plaintiff "[m]ust periodically alternate between sitting and standing to relieve pain and discomfort."  (R. 138.)

Plaintiff's impairments that were supported by the record, remand is not warranted on the basis claimed.

## 3.   **GAF Scores**

Plaintiff asserts that the ALJ erred in putting significant weight on the GAF scores.  (Doc. 12 at 20.)  I conclude this claimed error is without merit.

While Plaintiff is correct that "a GAF score does not itself necessarily reveal a particular type of limitation and is not an assessment of a claimant's ability to work," (Doc. 12 at 21 (citing *Wallace v. Astrue*, Civ. A. No. 2:07cv850, 2008 WL 2428926 (M.D. Ala. June 12, 2008))), ALJ Cutter did not rely only on GAF scores. Rather, he noted various GAF scores in conjunction with other evidence and his findings were based on a broad view of the evidence.  (R. 30-31, 33, 34.)

## 4.   **Credibility**

Plaintiff's final claimed error is that the ALJ erred in failing to find Plaintiff and his father credible.  (Doc. 12 at 21.)  I conclude the ALJ did not err on either basis.

Contrary to Plaintiff's assertion that the ALJ did not explain the standard he used for discounting his father's testimony (R. 22), the ALJ properly treated the third party function report completed by Plaintiff's father as opinion evidence and explained the weight he attributed to it (R. 33-34).  This consideration is consistent with Social Security Ruling 06-03p which addresses

consideration of opinions and evidence from sources who are not "acceptable medical sources."  SSR 06-03p, 2006 WL 2329939, at *6 (2006).

Plaintiff's assertion that the ALJ did not explain the standard used in assessing his credibility (Doc. 12 at 22) is also without merit.  Our review of the Decision reveals no error on this issue.

The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.'"  *Coleman v. Commissioner of Social Security*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)).  "Credibility determinations are the province of the ALJ and should only be disturbed on review if not supported by substantial evidence."  *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873 (3d Cir. 1983)).

Social Security Ruling 96-7p provides the following guidance regarding the evaluation of a claimant's statements about his or her symptoms:

> In general, the extent to which an
> individual's statements about symptoms can be
> relied upon as probative evidence in
> determining whether the individual is
> disabled depends on the credibility of the
> statements.  In basic terms, the credibility

37

> of an individual's statements about pain or
> other symptoms and their functional effects
> is the degree to which the statements can be
> believed and accepted as true.  When
> evaluating the credibility of an individual's
> statements, the adjudicator must consider the
> entire case record and give specific reasons
> for the weight given to the individual's
> statements.

SSR 96-7p.  An ALJ is not required to specifically mention relevant Social Security Rulings.  *See Holiday v. Barnhart*, 76 F. App'x 479, 482 (3d Cir. 2003).  It is enough that his analysis by and large comports with relevant provisions.  *Id.*

Here the ALJ explained the relevant two-step process (R. 27) and set out the reasons why he did not find that Plaintiff's conditions were as limiting as alleged (R. 34).  ALJ Cutter supports his findings with citations to the record sufficient to provide substantial evidence for this conclusions.  (R. 34.) Therefore, we cannot say the ALJ erred on the basis alleged.

### V. Conclusion

For the reasons discussed above, we have found all claimed errors to be without merit.  Therefore, Plaintiff's appeal of the Acting Commissioner's denial of benefits (Doc. 1) is denied.  An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: October 13, 2015